NO. 07-03-0125-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



APRIL 29, 2004



______________________________




IN THE MATTER OF THE MARRIAGE OF


DALE LANIER WILSON AND BRIDGET COLLEEN WILSON


AND IN THE INTEREST OF LONDON ANTHONY ARCHER WILSON


 AND AZZAN LUKE WILSON, MINOR CHILDREN



_________________________________



FROM THE 251ST DISTRICT COURT OF RANDALL COUNTY;



NO. 49,607-C; HONORABLE JOHN T. FORBIS, JUDGE



_______________________________




Before JOHNSON, C.J., and REAVIS and CAMPBELL, JJ.



MEMORANDUM OPINION


 Presenting three issues, Dale Lanier Wilson challenges the jury finding designating
Bridget Colleen Wilson as joint managing conservator with the exclusive right to determine
the domicile of the children of the marriage. By his first issue, Dale contends the jury
finding awarding Bridget the exclusive right to determine the domicile of the children is
against the great weight and preponderance of the evidence. By his second issue, he
contends the trial court abused its discretion in admitting evidence of his extramarital affairs
while he was married to his first wife some four years before the birth of the children the
subject of this suit and almost ten years from the date of trial, and by his third issue
contends the trial court abused its discretion in allowing an expert to testify for Bridget even
though the expert was not designated as an expert witness by her in response to his
proper request for disclosure. We affirm. 

 Before his marriage in 1993 to Bridget, Dale had one son by his first marriage. 
During his marriage to Bridget, London was born in 1996 and Azzan was born in 1999. 
Dale filed his original petition for divorce on February 20, 2001, alleging no fault grounds
and adultery. Among other things, Dale sought to be appointed temporary and permanent
managing conservator of the children. Acting upon Bridget's motion for psychological
examination, the trial court appointed Edwin Basham, EdD to interview, examine, and
evaluate the parents and children and file a written report which he filed on June 24, 2002.

 Following jury selection, testimony commenced on September 17, 2002, and the
case was submitted to the jury on September 19. As material to the question of joint
managing conservatorship of the children and which parent should have the exclusive right
to determine the domicile of the children, the court's charge was crafted as suggested by
PJC 215.9A and question 2 of PJC 216. (1) Among other instructions applicable to our
review, the trial court instructed the jury as follows:


 The best interest of the children shall always be the primary
consideration in determining questions of managing conservatorship
and questions of possession of and access to the children.

 You shall appoint both parents Joint Managing Conservators unless
you find that such an appointment is not in the best interest of the
children. In making this determination, you shall consider all of the
following factors: (2)

 In determining which party to appoint Sole Managing Conservator, or
to appoint Joint Managing Conservator, who will have the exclusive
right to establish the residence of the children and with whom the
children will primarily reside, you shall consider the qualification of
each party without regard to the gender of the party or the children or
the age of the children.

 In determining which party will establish the primary legal residence
of the children, you shall consider the qualifications of each party
without regard to the gender of the party or the children or the age of
the children.


 


By their answers, the jury found (1) Dale and Bridget should be appointed joint managing
conservators, (2) the children should primarily reside with Bridget, and (3) Bridget should
be entitled to establish the primary legal residence of the children if limited to Randall
County and contiguous counties.

 By his first issue, Dale contends the evidence was factually insufficient to support
the jury finding that Bridget should be awarded the exclusive right to determine the domicile
of the children. We disagree.

 Counsel for the parties recognize that the appropriate standard of review is set out
in Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241-42 (Tex. 2001); Croucher v. Croucher,
660 S.W.2d 55, 58 (Tex. 1983); and Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 
1986), and that Dale must demonstrate on appeal that the adverse finding is against the
great weight and preponderance of the evidence. Dale also has the burden to
demonstrate why the evidence that does not support the ruling is deficient when compared
to the other evidence of record. In re T.M., 33 S.W.3d 341, 349 (Tex.App.--Amarillo 2000,
no pet.).

 Dale suggests that the factor in determining conservatorship is set out in Holley v.
Adams, 544 S.W.2d 367, 371-72 (Tex. 1976), and section 153.002 of the Texas Family
Code. However, the Holley factors were not submitted with the charge. Further, the jury
was instructed they should "consider the qualifications of each party without regard to the
gender of the party or the children or the age of the children" in answering the question of
the children's primary residence. Because neither party presented any objections to the
charge or instructions, we will measure the evidence against the statement of law
contained in the charge even if defective. Household Credit Services, Inc. v. Driscol, 989
S.W.2d 72, 88 (Tex.App.--El Paso 1998, pet. denied), citing Sage Street Associates v.
Northdale Const. Co., 863 S.W.2d 438, 447 (Tex. 1993).

 The jury finding that both parents should be appointed joint managing conservators 
necessarily implies a sub-finding that the appointment was in the best interest of the
children. Dale limits his complaint to the jury finding that the children should primarily
reside with Bridget and does not complain of her appointment as joint managing
conservator. As applicable to this question, the court instructed the jury:

 Joint Managing Conservatorship does not require the award of equal or
nearly equal periods of physical possession of and access to the children to
each of the joint conservators; ordinarily the best interest of the child will
require the designation of a primary residence for the children.


(Emphasis added). Accordingly, in our review of Dale's argument that the finding is against
the great weight and preponderance, we must also review the evidence of the
qualifications of each parent.

 Dale's argument commences with the best interest of the children analysis in Holley.
544 S.W.2d at 371-72. However, because the Holley factors were not included in the
charge to the jury, we do not test the evidence before the jury by the Holley criteria. By his
analysis Dale then emphasizes isolated instances of Bridget's intoxication and association
with a male friend with a criminal record. The evidence demonstrated that both parents
had education beyond high school and held good jobs. By his brief, Dale does not attempt
to demonstrate why the evidence that does not support the finding is deficient when
compared to the other evidence in the record. In re T.M., 33 S.W.3d at 349. From our
review of the record, it appears that Bridget has maintained a responsible teaching position
during the marriage, managed employees and has missed minimum days at her job. A
former co-worker who had been terminated by Bridget, testified that Bridget was a good
worker and mother. 

 Pursuant to the court order for psychological examination, Dr. Basham interviewed
the parents and the children. (3) Among other things, his written report indicated:


 neither parent has a history of serious mental or emotional problems,
and


 

 

 the parents are cooperating with the temporary visitation schedule
and appear to be able to communicate with each other regarding the
important issues about the children. 




Although the report noted Bridget admitted occasional lapses in judgment, it also indicated
that she was an emotionally sensitive and caring mother. The report further established
that Dale is a highly involved and responsible father.

 Considering the instructions to the jury, Dale does not contend the jury finding
appointing Bridget as joint managing conservator was error, and the absence of an
explanation why the finding is deficient when compared to the other evidence in the record, 
we conclude that the jury answer to question two was not against the great weight and
preponderance of the evidence. Issue one is overruled. 

 By his second issue, Dale contends the trial court erred in admitting evidence of his
extramarital affairs while he was married to his former wife. We disagree. By his
pleadings, Dale made Bridget's extramarital affair an issue. Also, when Dale called his
former wife as a witness during his case-in-chief, he sought to establish by her testimony
that he was a good father and tried to instill moral values in their son. Then, during cross-examination, Bridget's attorney asked Dale's former wife 

 [w]as it not an immoral act on Dale's part that caused you some problems
during your marriage?


After a conference out of the presence of the jury, the trial court overruled Dale's objection. 
Among other things, the trial court noted that Dale had opened the door and allowed
questions which established that Dale also had an affair during his first marriage. Having
placed his own conduct in issue by the testimony of his former wife, he waived any
objection by inviting the alleged error of which he now complains. See General Chemical
Corp. v. De La Lastra, 852 S.W.2d 916, 920 (Tex. 1993), cert. dism'd, 510 U.S. 985, 114
S.Ct. 490, 126 L.Ed.2d 440 (1993). 

 Moreover, in Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex.
1998), the Court held that (1) evidentiary rulings are "committed to the trial court's sound
discretion," (2) a trial court abuses its discretion when it rules "without regard for any
guiding rules or principles," and (3) an appellate court must uphold the trial court's
evidentiary ruling if there is any legitimate bases for the ruling. Considering that the best
interest of the children was the court's "primary consideration in a suit affecting the parent-child relationship," see In re J.W., 113 S.W.3d 605, 612 (Tex.App.--Dallas 2003, pet.
denied), and the major objective of this appeal and Dale's trial strategy to make morality
an issue, we conclude the trial court did not abuse its discretion in admitting evidence of
his extramarital affair. Issue two is overruled.

 By his third issue, Dale contends the trial court abused its discretion is allowing Dr.
Basham to testify when called by Bridget over his objection even though Dr. Basham was
not designated as an expert witness by Bridget in response to Dale's proper request for
disclosure. We disagree.

 Dale does not contend the trial court erred in admitting the first amended order on
motion for psychological examination or the four and one-half page written child custody
evaluation of Dr. Basham, (4) but instead, limits his contention to the admission of Dr.
Basham's testimony. Although Dale does acknowledge that the propriety of the admission
of evidence is governed by an abuse of discretion standard, Gee v. Liberty Mut. Ins. Co.,
765 S.W.2d 394, 396 (Tex. 1989), he suggests that the application of Rule 193.6(a) of the
Texas Rules of Civil Procedure is a case of first impression. In its current form, Rule
193.6(a) excludes evidence not timely identified unless the court finds that:

 (1) there was good cause for the failure to timely make, amend, or
supplement the discovery response; or

 (2) the failure to timely make, amend, or supplement the discovery response
will not unfairly surprise or unfairly prejudice the other parties. (5)

 

The expert's involvement was developed outside the presence of the jury. According to
the evidence, on March 12, 2002, the trial court appointed the expert for a psychological
examination of the parties and the order was approved by both counsel. Bridget's attorney
requested the trial court take judicial notice of the file which contained the order appointing
the expert and his report. Among other things, the order directed that a detailed written
report of the evaluation by the expert be provided to all parties before March 30, 2002. 
Although Dale designated Dr. Basham as a person with knowledge and potential witness,
Bridget did not list nor designate the expert on her supplemental designation. Out of the
presence of the jury, Bridget's attorney argued that designation of the court ordered expert
was unnecessary or that it was unnecessary because Dale had designated the expert. 
Further, he argued that because a copy of the report had been filed Dale was not
surprised. At the conclusion of the hearing, the trial court expressly found (1) good cause
was shown by the fact that Dale designated the expert; and (2) that the element of surprise
was removed because Dale had designated the expert as a witness and the report was
part of the record. 

 In Mares v. Ford Motor Co., 53 S.W.3d 416, 419 (Tex.App.--San Antonio 2001, no
pet.), in considering a somewhat similar question regarding Rule 193.6, the court
concluded that a discovery sanction is reviewed under an abuse of discretion standard and
that the reviewing court must determine whether the trial court's action was arbitrary or
unreasonable. Given that Dale had actual notice (6) of the expert's opinion and the written
report several months before trial, had in fact designated the expert as a person with
knowledge, and the expert was of the opinion that (1) neither parent shows any likelihood
of being abusive or neglectful toward the children, and (2) both parents have a pattern of
close involvement with the children and appear to have provided adequate care for the
children, and (3) both children appear strongly attached to both parents, and considering
that the best interest of the children was of utmost importance, we conclude that the trial
court did not abuse its discretion in admitting Dr. Basham's testimony. Issue three is
overruled.

 Accordingly, the judgment of the trial court is affirmed.

 Don H. Reavis

 Justice
1. References are to Comm. On Pattern Jury Charges, State Bar of Tex., Texas
Pattern Jury Charges, (Family ed. 2002).
2. (1) whether the physical, psychological, or emotional needs and development of the
children will benefit from the appointment of joint managing conservators; (2) the ability of
the parents to give first priority to the welfare of the children and reach shared decisions
in the children's best interest; (3) whether each parent can encourage and accept a
positive relationship between the children and the other parent; (4) whether both parents
participated in children-rearing before the filing of the suit; (5) the geographical proximity
of the parents' residences; (6) not applicable because of age of children; and (7) any other
relevant factor.
3. Six hour interview with Dale and seven hour interview with Bridget. 
4. Bridget's exhibits 2 and 3 respectively. 
5. A finding of good cause or lack of unfair surprise or unfair prejudice must be
supported by the record. See Rule 193.6(b).
6. For purposes of pretrial procedure, the rules make no distinction in actual or
constructive notice. A. Copeland Enterprises, Inc. v. Tindall, 683 S.W.2d 596, 597
(Tex.App.--Fort Worth 1985, writ ref'd n.r.e).



the rental contracts were not binding on Verizon and,
therefore, there was no enforceable contract upon which Kan-Pak could assert its breach
of contract action.
          When both parties to a suit move for summary judgment, each party bears the
burden of establishing that it is entitled to judgment as a matter of law. City of Garland v.
Dallas Morning News, 22 S.W.3d 351, 356 (Tex. 2000). When the trial court grants one
party summary judgment and denies the other, we review both parties’ summary judgment
evidence, determine all questions presented, and render the judgment the trial judge
should have rendered. FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872
(Tex. 2000). When the trial court does not specify the basis on which it granted summary
judgment, the judgment will be affirmed on any meritorious ground expressly presented in
the motion and which is preserved for appellate review. State Farm Fire & Cas. Co. v.
S.S., 858 S.W.2d 374, 380 (Tex. 1993).
          Verizon moved for summary judgment on both traditional and no-evidence grounds,
while Kan-Pak’s motion asserted only traditional summary judgment grounds. See Tex.
R. Civ. P.166a. We review a summary judgment de novo to determine whether the movant
has established its right to summary judgment as a matter of law. See Dallas Cent.
Appraisal Dist. v. Cunningham, 161 S.W.3d 293, 295 (Tex.App.–Dallas 2005, no pet.). In
reviewing a summary judgment, we must examine the entire record in the light most
favorable to the nonmovant, indulging every reasonable inference and resolving any
doubts against the motion. See City of Keller v. Wilson, 168 S.W.3d 802, 824-25 (Tex.
2005). 
Enforceability of the Rental Contracts
          Verizon contends that it is entitled to summary judgment because it established, as
a matter of law, that GLM had no authority to enter into contracts on Verizon’s behalf and,
therefore, the rental contracts are not enforceable against Verizon.


 
          An agent cannot bind a principal unless the agent has actual or apparent authority
to do so. See Lifshutz v. Lifshutz, 199 S.W.3d 9, 22 (Tex.App.–San Antonio 2006, pet.
denied). Actual authority arises when the principal intentionally confers authority upon the
agent or intentionally or by want of ordinary care allows the agent to believe he has
authority. See id. Apparent authority exists when the principal’s acts would lead a
reasonably prudent person to believe that the agent had authority to act on behalf of the
principal, the principal has either affirmatively held out the agent as possessing authority
or knowingly and voluntarily permitted the agent to act in an unauthorized manner, and the
party relying on the agent’s apparent authority must have ascertained the fact and scope
of the agent’s authority. See Tex. Cityview Care Ctr., L.P. v. Fryer, 227 S.W.3d 345, 353
(Tex.App.–Fort Worth 2007, pet. dism’d by agr.). Only the actions of the principal can give
rise to apparent authority; actions or representations of the agent have no effect on the
determination. See id. Under either theory, the party alleging agency has the burden to
prove its existence. Id. at 352. 
          In the present case, there is no evidence in the record that would raise a fact issue
as to whether GLM had actual authority to contract on behalf of Verizon. The only
evidence relating to the actual authority that Verizon intentionally conferred on GLM is the
Waste Removal and Recycling Consultant Agreement between Verizon and GLM and a
letter of authorization that Verizon gave to GLM to present to potential vendors. Each of
these documents expressly provide that GLM was not authorized to enter into any
agreement or contract for services. Because this right was expressly denied GLM, we
cannot conclude that Verizon intentionally conferred authority to contract to GLM,
intentionally allowed GLM to believe that it had authority to contract on behalf of Verizon,
or that Verizon failed to exercise the degree of care necessary to prevent GLM from
believing that it had authority to contract on behalf of GLM. Thus, we agree with Verizon’s
summary judgment contention that it established, as a matter of law, that GLM did not have
actual authority to contract on Verizon’s behalf and, thus, Kan-Pak’s breach of contract
claims cannot be founded on the basis of GLM’s actual authority to enter into the rental
contracts on Verizon’s behalf.
          As to GLM’s apparent authority, we are constrained to review only the evidence of
the actions of Verizon in determining whether Kan-Pak could reasonably believe that GLM
had authority to enter into the rental contracts on behalf of Verizon. See id. at 353. The
evidence of Verizon’s actions as it relates to whether they would lead a reasonably prudent
person to believe that GLM was acting on Verizon’s behalf is the letter of authorization that
specifically defines the scope of GLM’s agency and expressly prohibits GLM from
contracting on Verizon’s behalf. There is no evidence that Verizon held GLM out as having
authority to contract on its behalf. Most significantly, however, is that there is no evidence
that Kan-Pak ascertained the fact and scope of GLM’s authority, which is a required
element of a claim of apparent authority. See id. Kan-Pak was notified, by the letter of
authorization, that GLM did not have authority to bind Verizon to a contract and, further,
there is no evidence that Kan-Pak took any action to ascertain that GLM had been granted
greater authority than what was expressly identified in the letter of authorization. Because
there is no evidence to support one or more elements of a claim that Verizon is bound by
the rental contracts because GLM had apparent authority to contract on behalf of Verizon,
Kan-Pak’s breach of contract claims may not rest on the apparent authority of GLM to
enter into the rental contracts on behalf of Verizon.
Ratification
          However, even though Verizon is not bound by the rental contracts based on the
actual or apparent authority of GLM to contract on Verizon’s behalf, Verizon would still be
bound by the contracts if it acted in a manner that ratified these contracts. In its motion for
summary judgment, Kan-Pak contends that Verizon ratified the rental contracts by directly
making 156 monthly payments under the rental contracts over the course of five to seven
years. Kan-Pak further cites evidence that GLM paid another 148 monthly payments. By
its summary judgment motion, Verizon contends that its actions were insufficient as a
matter of law to ratify the rental contracts and that it could not have ratified the rental
contracts before December 2006 because it was not aware of the material terms of the
contracts. Remaining mindful that this issue is presented in the context of competing
motions for summary judgment, we are required to examine the entire record in the light
most favorable to the nonmovant, indulging every reasonable inference and resolving any
doubts against the motion. See City of Keller, 168 S.W.3d at 824-25.
          Ratification of a contract occurs when a party recognizes the validity of the contract
by acting under the contract, performing under the contract, or affirmatively acknowledging
the contract. Stable Energy, L.P. v. Newberry, 999 S.W.2d 538, 547 (Tex.App.–Austin
1999, pet. denied). However, a party can only ratify a contract if, at the time of ratification,
it knew all of the material terms of the contract. See T & R Assocs., Inc. v. City of Amarillo,
688 S.W.2d 622, 630 (Tex.App.–Amarillo 1985, writ ref’d n.r.e.). Thus, if a party acts in
a manner that recognizes the validity of a contract with full knowledge of the material terms
of the contract, the party has ratified the contract and may not later withdraw its ratification
and seek to avoid the contract. See Spellman v. Am. Universal Inv. Co., 687 S.W.2d 27,
29-30 (Tex.App.–Corpus Christi 1984, writ ref’d n.r.e.). Any retention of the beneficial part
of the transaction affirms the contract and bars rescission as a matter of law. Id. at 30.
          Kan-Pak contends that Verizon’s direct payment of 156 monthly payments on three
of the five contracts over the course of five to seven years coupled with GLM’s payment
of 148 monthly payments on the remaining contracts is sufficient evidence to establish that
Verizon ratified the rental contracts as a matter of law. However, there is no direct
evidence that, prior to December 2006, Verizon had any knowledge of all of the material
terms of the rental contracts. Certainly, there is no direct evidence that Verizon made
those payments with knowledge that the terms of the rental contracts included a 60 month
term that would be automatically renewed for an additional 60 month term if not terminated
in writing within 60 days of the expiration of the initial 60 month term. For Verizon to have
ratified the rental contracts, it would have to be shown that Verizon had knowledge of the
material terms of the contract at the time that it performed under the contract. Because,
prior to December 2006, there is no direct evidence that Verizon knew the material terms
of the rental contracts that it was performing under, we cannot conclude that Verizon
ratified the rental contracts as a matter of law by paying the monthly rental payments.



          However, the evidence does establish that Verizon received copies of the rental
contracts in December 2006. Verizon made no direct monthly rental payments under the
rental contracts after it received copies of the rental contracts.


 Further, in February 2007,
Verizon contacted Kan-Pak and expressly repudiated the rental contracts.


 Looking at the
entire record and indulging all reasonable inferences in favor of Verizon, we conclude that
Verizon took no action after December of 2006 that ratified the rental contracts prior to its
express repudiation of those rental contracts in February 2007. Thus, Kan-Pak has failed
to establish that it was entitled to summary judgment on the basis that Verizon ratified the
rental contracts.
          Verizon contends, in support of its motion for summary judgment, that the evidence
establishes that it did not ratify the rental contracts as a matter of law. As discussed
above, Verizon received services and made monthly rental payments under the rental
contracts for five to seven years. Thus, Verizon retained some benefit under the rental
contracts and the retention of this benefit is some evidence of ratification. See Spellman,
687 S.W.2d at 30. Further, Verizon contends that GLM had no authority to contract on
Verizon’s behalf, yet Verizon acknowledges that it “knew that Kan-Pak had installed
compactors at its sites and what Kan-Pak was charging for each month’s rent.” We believe
that the presence of Kan-Pak’s compactors at five of Verizon’s Texas facilities and the
invoicing of monthly rental charges gives rise to a reasonable inference that a reasonably
prudent business would have investigated the basis of the monthly rental invoices and that,
in the exercise of ordinary diligence, such an investigation would have revealed the terms
of the rental contracts. While we cannot say that Verizon’s accepting of the benefits of the
rental contracts, without proof of its knowledge of the material terms of the rental contracts,
was a ratification of those contracts, we do conclude that Verizon’s conscious indifference
to discovering the terms of the rental contracts gives rise to a reasonable inference that it
knew or, at least, should have known the material terms of the rental contracts. As such,
we conclude that the evidence raises a genuine issue of material fact as to whether
Verizon ratified the rental contracts by making monthly rental payments under those
contracts. Therefore, we affirm the trial court’s denial of Verizon’s motion for summary
judgment.
Equitable Estoppel
          Finally, Kan-Pak contends that Verizon is equitably estopped from denying the
validity of the rental contracts based on its payment of the monthly rental charges. 
          A claim of equitable estoppel requires proof of five elements: (1) a false
representation or concealment of material facts, (2) done with actual or constructive
knowledge that the representation was false or that the concealed facts were material, (3)
made to a party without knowledge or the means to discover the facts, (4) with intent that
the other party act upon the representation or concealment, and (5) the other party
detrimentally relied on the representation or concealment. See Hausman v. Hausman, 199
S.W.3d 38, 43 (Tex.App.–San Antonio 2006, no pet.). 
          However, in the present case, Kan-Pak has presented no evidence that would
establish, as a matter of law, that Verizon made any knowing false representation or
intentionally concealed any material facts relating to the rental contracts. As discussed
above, it is possible that Verizon had knowledge of the terms of the rental contracts and
continued to receive the benefit of those rental contracts, which might rise to the level of
an intentional concealment of material fact, but the evidence does no more than raise an
inference of that fact and, therefore, is insufficient to support Kan-Pak’s motion for
summary judgment. Because Kan-Pak has failed to establish as a matter of law that
Verizon is equitably estopped from denying the validity of the rental contracts, the trial court
could not have granted summary judgment on that basis.
Conclusion
          Because genuine issues of material fact are raised by the evidence as to each of
the grounds upon which Kan-Pak moved for summary judgment and because the evidence
does not establish that Verizon did not ratify the rental contracts as a matter of law, we
reverse the trial court’s grant of summary judgment in favor of Kan-Pak and affirm the trial
court’s denial of Verizon’s motion for summary judgment.
Damages
          Finally, Verizon contends that the trial court erred in denying its motion for new trial
because the trial court’s award of actual damages was not discounted to present value. 
Because we have reversed the trial court’s summary judgment, the award of damages has
also been reversed. As such, the issue of the propriety of the trial court’s award of
damages is not before this Court. The “judicial power does not embrace the giving of
advisory opinions.” Gen. Land Office of Texas v. OXY U.S.A., Inc., 789 S.W.2d 569, 570
(Tex. 1990) (quoting Fireman’s Ins. Co. v. Burch, 442 S.W.2d 331, 333 (Tex. 1968)).
Conclusion
          For the foregoing reasons, we reverse the trial court’s grant of summary judgment
in favor of Kan-Pak, affirm the trial court’s denial of Verizon’s motion for summary
judgment, and remand the cause to the trial court.
 
                                                                           Mackey K. Hancock

                                                                                      Justice